UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| INNOVATE1, et al, <br>    *Plaintiffs*, <br> <br> v. <br> <br> FIRST BRIDGE MERCHANT <br> SOLUTIONS, LLC, et al, <br>    *Defendants*. | )    3:19-CV-01123 (KAD) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    August 13, 2020 |

**MEMORANDUM OF DECISION RE: DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER VENUE (ECF NO. 15)**

Kari A. Dooley, United States District Judge

This action arises out of a payment processing dispute between Plaintiffs Innovate1 Services, Inc. ("Innovate1") and Anthony Nwachukwu, its President, and Defendants First Bridge Merchant Solutions, LLC ("FBMS"), Marc Geolina ("Geolina"), an FBMS Member, Ryan Rainey ("Rainey"), an FBMS Member, and Does 1 through 3.[1] Among other allegations, Plaintiffs allege that FBMS failed to remit payments of approximately $1 million in breach of the Merchant Application and Merchant Account Agreement & Program Guide (collectively, the "Account Agreement") entered into by Innovate1 and FBMS in December 2016. On October 4, 2019, Defendants FBMS, Geolina, and Rainey (hereinafter, "Defendants") filed the instant motion to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) or, in the alternative, to transfer venue to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a). For the following reasons, Defendants' motion to dismiss is GRANTED in part and this matter is ordered transferred to the Central District of California.

---

[1] According to Plaintiffs, these Does are banks used by Defendants for payment processing.

**Background**

The following is alleged in Plaintiffs' complaint.[2] On or about December 15, 2016, Innovate1 and FBMS entered into the Account Agreement by which FBMS "was to process payments for Innovate1's clients, transfer the money to Innovate1 and then to transfer these amounts to its clients. The fee that FBMS charges also includes Innovate1's commissions. In this case, FBMS processed payments but never transferred those payments to Innovate1, and also did not transfer the relevant commission. As a result, the merchants did not receive their money and Innovate1 did not receive its commission. Indeed, Innovate1 was forced to pay certain merchants from its own account because FBMS failed to transfer the funds at issue." Complaint, ECF No. 1 ¶ 11. Specifically, FBMS failed to remit at least $713,000 to Innovate1 in violation of the Account Agreement.

Pursuant to the Account Agreement, FBMS agreed to open "a non-interest bearing secured reserve deposit" account at a bank (hereinafter, "reserve account"). *Id*. ¶ 16. Despite Plaintiffs reaching out to FBMS to learn the reserve account details, FBMS and Geolina failed to comply with Plaintiffs' requests for information regarding "the name of the bank, name of bank officer(s) in charge of the account, detailed accounting of the transactions and the amount being held, or withheld in the account[,]" or "an accounting, or statements as to the amount in said account that is due and owing to Innovate1 and its clients." *Id*. ¶¶ 16, 18. Instead, Geolina "repeatedly and fraudulently assured Innovate1 that payment either had been made or was forthcoming, assurance[s] which were false and upon which Innovate1 reasonably and justifiably relied." *Id*. ¶ 34.

---

[2] The allegations are both repetitive and difficult to follow. It is not clear the nature of Plaintiff's business, the services or products it provides to its clients or the intended structure of the various financial transactions implicated by the Account Agreement. A review of the Account Agreement, attached to Defendant Geolina's affidavit, (ECF No. 17 at 9–13), provides no real clarity on these issues.

FBMS, Geolina, and Rainey also conducted a "know your client" ("KYC") review of Innovate1 upon entering into the Account Agreement in December 2016. On or about February 14, 2017, Geolina told Plaintiffs that they were compliant with the bank. Regardless, the funds due to Plaintiffs were never released to Innovate1. Indeed, "Innovate1 complained to the [D]efendants regarding the continuous delays in the funds to their clients being released, the interest deduction being charged, [and] the amount of funds being withheld by the [D]efendants' bank as a reserve." *Id*. ¶ 39. Despite Plaintiffs advising Rainey on or about December 27, 2017 via e-mail of their complaints, Defendants did not accommodate their requests. Instead, on January 5, 2018, Geolina requested documents "under the guise of KYC by FBMS/Bank Doe." *Id*. ¶ 41. Thereafter, on or about January 29, 2018, Plaintiffs reached out to Geolina to inquire "why FBMS, or its Bank Doe were arbitrarily withholding funds beyond the agreed upon period under the guise of KYC even though one was performed prior to the start of the contract." *Id*. ¶ 42. On the same day, Geolina responded that he would resolve the issues with the bank regarding the withholding of funds. However, Geolina never gave Plaintiffs the information they asked for regarding the reserve account or the release of funds.

Eventually, on or about February 24, 2019, Plaintiffs sent a letter to Geolina informing him that Innovate1 and its affiliated companies would no longer conduct business with FBMS or any bank, financial institution, or company affiliated with FBMS. The letter also "demanded an accounting on all merchant accounts processed by Innovate1 through FBMS, name(s) of the bank(s) where the non-interest bearing account holding the reserve funds were being kept, name of the banker(s) and return of the funds to Innovate1." *Id*. ¶ 49. On March 13, 2019, Geolina responded by letter that the reserve funds, with a balance of $713,980, could be held in escrow until the liability and risk period to FBMS expired on April 6, 2020. Additionally, Geolina, in the

3

letter and thereafter, insisted that Plaintiffs give him their bank account where he could make ACH deposits. Geolina told Plaintiffs that he needed an account number "so that the ACH deposits of the reserve can be refunded to Innovate1." *Id*. ¶ 59. Still, "[n]o refunds from the reserve account have been made to Innovate1[.]" *Id*. ¶ 61.

Further, according to Geolina's March 13, 2019 letter, the reserve account had been terminated due to laundering risk. Despite the laundering allegation, Geolina continually reached out to Innovate1 for business. Moreover, Plaintiffs believe that the Defendants made false claims to government authorities regarding Innovate1 engaging in transaction and money laundering because Defendants feared losing Innovate1's business after Innovate1 started complaining about FBMS's services. As a result of these false claims, Nwachukwu, a U.S. Citizen, experienced difficulty traveling, including extensive searches and interrogations by U.S. Customs and Border Protection agents.

**Procedural History**

Based on the foregoing allegations, on July 22, 2019, Plaintiffs filed a complaint consisting of the following seventeen causes of action:

| Count | Cause of Action | Defendants Named |
|---|---|---|
| 1 | Breach of Contract | FBMS, Geolina |
| 2 | Breach of the Implied Covenant of Good Faith and Fair Dealing | All Defendants |
| 3 | Open Book Account | FBMS, Geolina |
| 4 | Account Stated | FBMS, Geolina |
| 5 | Breach of Fiduciary Duty | FBMS, Geolina |
| 6 | Intentional Misrepresentation | FBMS, Geolina, Rainey |
| 7 | Negligent Misrepresentation | FBMS, Geolina, Rainey |
| 8 | Tortious Interference | All Defendants |

| 9 | Breach of Guarantee | FBMS, Geolina, Rainey |
|---|---|---|
| 10 | Violation of CUTPA | All Defendants |
| 11 | Negligence | All Defendants |
| 12 | Conversion | All Defendants |
| 13 | Statutory Theft | All Defendants |
| 14 | Unjust Enrichment | All Defendants |
| 15 | Accounting Pursuant to Common Law | FBMS, Geolina, Rainey |
| 16 | Slander | All Defendants |
| 17 | Libel | All Defendants |

Thereafter, on October 4, 2019, Defendants FBMS, Geolina, and Rainey moved to dismiss the complaint for lack of personal jurisdiction and improper venue pursuant to Rules 12(b)(2) and 12(b)(3) or, in the alternative, to transfer venue to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404(a). Plaintiffs oppose the motion seeking to keep the action before this Court.

**Venue**

As a preliminary matter, the Court finds that there is "sound prudential justification" to consider venue before personal jurisdiction. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) ("[W]hen there is a sound prudential justification for doing so, we conclude that a court may reverse the normal order of considering personal jurisdiction and venue."). Because the Court finds below that venue is not proper in Connecticut and that, pursuant to 28 U.S.C. § 1406(a), the case shall be transferred to the Central District of California, the Court does "not need to conduct the more detailed examination" regarding whether Defendants are subject to personal jurisdiction in Connecticut. *Seungick Chung v. Grace Rd. Church*, No. 3:13CV1760 JBA, 2014 WL 6911346, at *1 (D. Conn. Dec. 8, 2014) (finding it appropriate to consider venue before personal jurisdiction

5

because if venue is improper the court would not need to address the "more detailed examination" of whether Defendants were subject to personal jurisdiction in Connecticut); *see also Basile v. Walt Disney Co.*, 717 F.Supp.2d 381, 385 (S.D.N.Y. 2010) ("[I]t seems prudentially appropriate to address venue first since a decision to transfer would render personal jurisdiction analysis with respect to this district irrelevant.").

**Standard of Review**

In deciding a motion to dismiss for improper venue under Rule 12(b)(3), the Court applies the same standard of review as it does for motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2). *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). Thus, "[p]rior to discovery, a plaintiff challenged by a [venue] testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of [venue]. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) (*per curiam*). "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of [venue] has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (summary order). "A plaintiff can make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited . . ., would suffice to establish [venue]." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal citations, quotation marks, and brackets omitted). Importantly, the Court must "view all the facts in a light most favorable to plaintiff." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007). If the Court determines that venue is not proper, the Court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). As discussed further below, "[w]hether dismissal or transfer is appropriate lies within

the sound discretion of the district court." *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993).

**Discussion**

Venue is proper in the following judicial districts:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)-(3). Here, venue is properly asserted only if the District of Connecticut is "a judicial district in which a substantial part of the events or omissions giving rise to the claim[s] occurred[.]"[3] 28 U.S.C. § 1391(b)(2) (hereinafter, "Subsection 1391(b)(2)"). While Subsection 1391(b)(2) allows for "venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts, . . . [district courts are cautioned] to take seriously the adjective 'substantial.'" *Glasbrenner*, 417 F.3d at 356–57. Indeed, courts must "construe the venue statute strictly." *Id.* at 357 (citing *Olberding v. Illinois Cent. R.R.*, 346 U.S. 338, 340 (1953)). Accordingly, "for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Glasbrenner*, 417 F.3d at 357 (emphasis in original). Notably, the "'substantial part' test [does not mirror] the minimum contacts test employed in personal jurisdiction inquiries." *Id.*

---

[3] Regarding Subsection 1391(b)(1), all defendants are not Connecticut residents. Defendants Geolina and Rainey do not reside in Connecticut. *See* Complaint, ECF No. 1 ¶ 8 (alleging that Geolina and Rainey are citizens of California); Geolina Aff., ECF No. 17 ¶ 21 (stating residence is California); Rainey Aff., ECF No. 18 ¶ 3 (stating residence is Arizona). Regarding Subsection 1391(b)(3), in their opposition to Defendants' motion to dismiss, Plaintiffs concede that they "could have brought suit in the [Central District of California]." ECF No. 21 at 16.

When venue is challenged under Subsection 1391(b)(2), the Court should (1) "identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims," and (2) "determine whether a substantial part of those acts or omissions occurred . . . in the district in question." *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (internal quotation marks and citation omitted). Determining substantiality for venue purposes requires a qualitative analysis and assessment of "the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum," as opposed to a quantitative computation of contacts with the forum. *Id.* at 432–33; *NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 3:18-CV-1023 (MPS), 2019 WL 1173019, at *12 (D. Conn. Mar. 13, 2019) (same). "When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue." *Daniel*, 428 F.3d at 433. As relevant here, "[c]ourts making venue determinations in contract disputes have looked to such factors as where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Glasbrenner*, 417 F.3d at 357 (internal quotation marks omitted).

To be sure, "the plaintiff is not required to establish that his chosen venue has the most substantial contacts to the dispute; rather, it is sufficient that a substantial part of the events occurred [in the chosen venue], even if a greater part of the events occurred elsewhere." *Indymac Mortg. Holdings, Inc. v. Reyad*, 167 F. Supp. 2d 222, 237 (D. Conn. 2001) (internal quotation marks omitted); *see also Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) (Subsection 1391(b)(2) "does not, as a general matter, require the District Court to determine the best venue").

Here, Defendants assert that no substantial part of the events giving rise to Plaintiffs' claims occurred in Connecticut. They rely principally on the fact that the Account Agreement was negotiated and formed by remote discussions while the Defendants were in California and that all performance by Defendants under the Account Agreement occurred in California. Accordingly, by necessity, the Defendants conduct, purportedly in breach of their obligations under the Account Agreement and otherwise giving rise to the multiple causes of action alleged, had to have occurred in California.

In response, Plaintiffs argue that a substantial part of the events giving rise to their claims did occur in Connecticut insofar as: (1) Defendants solicited the Connecticut-based Plaintiffs to use Defendants' payment processing services; (2) Defendants interacted with Plaintiffs' clients through Plaintiffs' Connecticut-based website; and (3) Plaintiffs suffered the injury in Connecticut.[4]

In assessing the nature of the Plaintiffs' claims and the conduct or omissions giving rise to those claims, the Court agrees with the Defendants and finds the Plaintiffs' arguments unpersuasive. Indeed, it is readily apparent that venue is not proper in Connecticut.

Although Plaintiffs' complaint is a lengthy recitation of the interactions between the parties over the course of the last several years, the allegations essentially begin with the execution of the Account Agreement in December 2016 and thereafter describe the myriad of ways that the Defendants did not meet their obligations under the Account Agreement. The dispute can be distilled down to a claim that the Defendants improperly withheld funds and information from the Plaintiffs in violation of the Account Agreement.[5]

---

[4] The Court notes that the Plaintiffs advanced no arguments regarding the slander and libel allegations in connection with issues germane to personal jurisdiction, venue, or transfer.

[5] Although the circumstances surrounding the solicitation, negotiation and execution of the Account Agreement appear nowhere in the Complaint, and none of the Plaintiffs' claims therefore appear to derive from those events, the parties

As to the core allegation that the Defendants withheld monies due under the Account Agreement, the parties agree that pursuant to the terms of the Account Agreement, FBMS set-up a reserve account for Innovate1. Therein, Innovate1's clients' gross receipts would be deposited and the funds due to Innovate1 would ultimately be remitted to Innovate1 via a bank account designated by Innovate1. Plaintiffs allege that Defendants improperly failed to remit funds due to Plaintiffs from the reserve account. Thus, for the venue analysis, the locus of the Defendants when managing the reserve account and the locus of the reserve account itself is where a substantial part of the events giving rise to Plaintiffs' claims took place. For their part, Plaintiffs allege that they do not even know where the reserve account is located insofar as this information was wrongfully withheld by the Defendants. *See* Complaint, ECF No. 1 ¶ 16. Though curiously evasive, Defendants aver that "FBMS set up [the] reserve bank account with a banking institution that is not based in Connecticut," and that "maintenance of the [reserve account] by FBMS took place entirely in California." Geolina Aff., ECF No. 17 ¶¶ 16–17. Plaintiff does not counter either of these assertions.

Rather, Plaintiffs first argue that "a substantial part of the events giving rise to the instant claim took place in Connecticut [insofar as] FBMS was falsely advertising its services to the Plaintiff . . . in Connecticut." ECF No. 21 at 15. Similarly, Plaintiffs argue that the "marketing [and] contracting . . . did not take place in California, but rather in Connecticut." *Id*. Plaintiffs are incorrect. Even though Plaintiffs were located in Connecticut throughout the solicitation, negotiation and execution of the Account Agreement, Defendants' conduct in this regard all would have occurred in California. *See Success Sys., Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 58 (D.

---

discuss these events in the context of the venue challenge. While the Court questions whether these events, even if they occurred in Connecticut, could ever be a basis for venue in this district given the allegations in the Complaint, the Court addresses the competing arguments above.

Conn. 2020) (finding venue improper, in part, because Texas defendants' alleged over-the-phone communications, including omissions and misrepresentations, with Connecticut plaintiffs were determined to have occurred in Texas rather than in Connecticut); *see also MAK Mktg., Inc. v. Kalapos*, 620 F. Supp. 2d 295, 310 (D. Conn. 2009) ("[I]n the context of a motion to transfer, misrepresentations and omissions are deemed to occur in the district where they are transmitted or withheld, not where they are received." (internal quotation marks omitted)). Indeed, Plaintiffs admit that Defendants' alleged solicitations and misrepresentations never occurred in-person in Connecticut, but rather over the phone and via e-mail. *See* Nwachukwu Aff., ECF No. 21-1 ¶¶ 11, 14 ("I was inundated with phone calls and emails soliciting our business and offering better rates than ever before by Geolina. . . . Geolina left messages for me aggressively soliciting to be our merchant payment provider and he also contacted [Innovate1's] manager, Theresa Mahoney to solicit our business."; "Geolina . . . sent the FBMS application form to me via email. I read, printed it out, filled out the application, and sent it back to him via email from my office in Avon, Connecticut."); Mahoney Aff., ECF No. 21-2 ¶¶ 4, 9 ("I have never met [Geolina or Rainey] in person but we have communicated telephonically and through emails over the past five years."; "[Geolina and Rainey contacted] me via the telephone pleading for our business and promising better rates than the competition."). Because Defendants' alleged interactions with Plaintiffs regarding the solicitation and execution of the Account Agreement did not occur in Connecticut, these interactions cannot serve as a basis for venue in Connecticut.

Plaintiffs also assert, though advanced in connection with their argument regarding personal jurisdiction,[6] that FBMS's payment platform included a technological interface with

---

[6] Plaintiffs begin their argument regarding venue by referencing their argument on the issue of personal jurisdiction. As discussed above, the inquiries are very different, but to the extent the Plaintiffs incorporated this argument into their venue analysis, the Court addresses it.

Innovate1's website in Connecticut. Therefore, they argue, every transaction for which FBMS collected funds occurred, in part, in Connecticut. Regardless of whether Defendants did in fact interact with Plaintiffs' clients in this manner, which they deny, any such interaction has little to do with Plaintiffs' claims. While the method by which funds flowed to FBMS under the Account Agreement may have involved this interaction, this dispute is about the Defendants' conduct after those funds were received. Indeed, there is no claim that the funds were improperly received by the Defendants in the first instance. Thus, the flow of the information necessary to secure the funds, in terms of location, is irrelevant with respect to whether those funds were improperly withheld by the Defendants after they were deposited in the reserve account. Accordingly, FBMS's alleged interactions with Innovate1's clients through the Connecticut-based website cannot serve as a basis for venue in Connecticut.

Lastly, Plaintiffs argue that "ultimately [the] majority of the injuries suffered by the Plaintiff did not take place in California, but rather in Connecticut." ECF No. 21 at 15. However, Plaintiffs' injury is deemed to have occurred where the Defendants administered the reserve account or wherever the reserve account is located, i.e., "where the critical events associated with the dispute took place." *Bross Utilities Serv. Corp. v. Aboubshait*, 489 F. Supp. 1366, 1374 (D. Conn.), *aff'd*, 646 F.2d 559 (2d Cir. 1980) (construing Connecticut's long-arm statute, and collecting cases with respect to New York's similarly worded statute, held that "in the context of commercial torts, the place of injury is generally the place where the critical events associated with the dispute took place" (internal quotation marks omitted)); *see also Halo Tech Holdings, Inc. v. Cooper*, 2008 WL 877156, at *10 (D. Conn. Mar. 26, 2008) ("The mere fact that a plaintiff that is domiciled or incorporated in Connecticut loses profits or suffers some other pecuniary injury does not necessarily mean it suffered direct economic injury in Connecticut."). As discussed above, the

critical events giving rise to the dispute in this action are the Defendants' maintenance of the reserve account and the alleged withholding of Plaintiffs' funds in the reserve account. And also as discussed above, Plaintiffs have not sufficiently alleged or established that either of those events occurred in Connecticut. Therefore, even if Plaintiffs' injury could be considered a "substantial part" of the events that gave rise to their claims, they have not shown that they suffered that injury in Connecticut.[7] As a result, the location of Plaintiffs' alleged injury cannot serve as a basis for venue in Connecticut.

**Transfer**

As noted, Section 1406 provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The parties agree that this case "could have been brought" in the United States District Court for the Central District of California. *See* 28 U.S.C. § 1391(b)(2) (Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]").[8]

---

[7] In any event, the Second Circuit has observed that the venue inquiry should focus on the defendant's relevant activities. *Daniel*, 428 F. 3d at 432 (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) ("by referring to 'events [or] omissions giving rise to the claim,' Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff")); *see also Astor Holdings, Inc. v. Roski*, No. 01 CIV. 1905 (GEL), 2002 WL 72936, at *9 (S.D.N.Y. Jan. 17, 2002) ("There is an obvious potential for unbounded venue if the courts were to find venue regardless of where the acts occurred, based solely on the existence of economic harm felt in the district where the plaintiff resides or is headquartered. Therefore, while the locus of the harm suffered is a factor to consider, the case law does not support the theory that venue is proper on an economic-effects inquiry alone[.]").

[8] Defendants have also consented to personal jurisdiction in California by moving to transfer venue to the Central District of California. *See Marotto v. Kellogg Co.*, No. 18 CIV. 3545 (AKH), 2018 WL 10667923, at *5 (S.D.N.Y. Nov. 29, 2018) (finding that Defendants were subject to personal jurisdiction in California by implied consent because Defendants moved to transfer the venue from New York to California) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) ("We have noted that, because the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court." (internal quotation marks omitted))).

"Courts enjoy considerable discretion in deciding whether to transfer a case in the interest of justice." *Daniel*, 428 F.3d at 435. While courts should "not waste judicial resources by transferring a case that is clearly doomed," *id.* at 436 (quotation marks and citation omitted), the merits of this case have yet to be litigated. Indeed, it remains in a relatively nascent procedural posture, the parties having agreed to postpone discovery pending the outcome of the instant motion. And although the Court has determined that Connecticut is not the proper forum for this dispute, there is nothing to suggest that Plaintiffs were not diligent or operating in good faith when they selected Connecticut as the forum in which to assert their claims. *See Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992) (concluding that transfer "would not be in the interest of justice" if it "would reward plaintiffs for their lack of diligence in choosing a proper forum"). Nor would litigating in the Central District of California unduly prejudice the Defendants when it is the District in which two of the Defendants are domiciled and to which, in the alternative, they sought transfer pursuant to 28 U.S.C. § 1404. *See*, *e.g.*, *U.S. ex rel. Smith v. Yale Univ.*, No. 3:02-CV-1205 (PCD), 2006 WL 1168446, at *3 (D. Conn. Apr. 28, 2006) (concluding that "transfer would work no hardship on Defendants' ability to defend against the claim on the merits" when they "are both New York entities and presumably will find it easier to defend a suit in New York than in Connecticut"). Lastly, although the Court recognizes that the Connecticut-based Plaintiffs may suffer inconveniences by litigating in California, *see Corke v. Sameiet M. S. Song of Norway*, 572 F.2d 77, 80–81 (2d Cir. 1978) (considering whether transfer would result in hardship to either party), such inconveniences arise out of Plaintiffs' choice to do business with a California-based company and the nature of Plaintiffs' claims. Plaintiffs also failed to suggest any other viable alternative as to venue in the event the Court found that venue was not proper in Connecticut. The

Court therefore finds that it is in the interest of justice to transfer this case to the Central District of California.

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part pursuant to Rule 12(b)(3). The Clerk of the Court is directed to transfer this matter to the Central District of California.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of August 2020.

                                                 */s/ Kari A. Dooley*
                                                 KARI A. DOOLEY
                                                 UNITED STATES DISTRICT JUDGE